UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | CHAPTER 7 C |
| **SIGNED this 22nd day of October, 2013.** | § | |
| BRADLEY L. CROFT, | § | |
| Debtor. | § | |

*Craig A. Gargotta*

CRAIG A. GARGOTTA
UNITED STATES BANKRUPTCY JUDGE

| | | |
|---|---|---|
| JEANNETTE BARBARA LOWRY, ET AL., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 12-05027-CAG |
| | § | ADV. NO. 12-051140-CAG |
| | § | ADV. NO. 12-05026-CAG |
| | § | |
| BRADLEY L. CROFT, | § | (Jointly Consolidated as |
| | § | Adv. No. 12-05027) |
| Defendant. | § | |
| | § | |

## MEMORANDUM OPINION

This Memorandum Opinion resolves three related adversary proceedings – *Judy A. Robbins United States Trustee, Region 7 v. Bradley L. Croft*, Adv. No. 12-05026-CAG ("Robbins"); *Jeanette Barbara Lowry, AMS SA Management, LLC, d/b/a Association Management Services, and Shavano Rogers Ranch Swim Club, Inc. v. Bradley L. Croft*, Adv. No. 12-05027-CAG ("the Lowry Plaintiffs"); and *Jeanette Barbara Lowry v. Bradley L. Croft, and Kevin W. Stouwie, as Trustee of the Willawall Investments Trust*, Adv. No. 12-05114-CAG ("Lowry"). All three matters were consolidated together for purposes of discovery, pre-trial motions, and trial into Adversary No. 12-05027-CAG. *See* Order on Motion for Consolidation

1

and to Extend Pre-trial Deadlines. (ECF No. 16).[1] This Court conducted a six day trial before taking the matter under advisement. Trial was concluded on June 25, 2013, and the Court instructed the parties to submit post-trial pleadings regarding the evidence received and how it supported a party's claims for or against relief. The Court has reviewed the entire record before it; including all admitted exhibits and the weight of the testimony and credibility of all witnesses. Additionally, the Court has also carefully considered all evidentiary objections raised and sustained in making its findings of fact.

As an initial matter, the Court finds that it has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157 and 1334 (2006). This matter is a core proceeding as defined under 28 U.S.C. § 157(b)(2)(I) (determination of discharge of particular debts) and (J) (objections to discharge). The Court finds venue is proper under 28 U.S.C. § 1408(1). This matter is referred to the Court pursuant to the District's Standing Order on Reference. The Court may make its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

On August 23, 2011 (the "Petition Date"), Defendant Bradley L. Croft filed a pro se voluntary Chapter 7 petition for relief. (UST[2] – 001). According to his schedules, Defendant seeks a discharge of $646,000 in unsecured claims. *In re Croft*, Case No. 11-52905-CAG (Chapter 7). As noted herein, the U.S. Trustee and the Lowry Plaintiffs (collectively, the "Plaintiffs") seek a denial of Debtor's discharge under related provisions of 11 U.S.C. § 727.[3] The majority of evidence adduced at trial involved the Court's consideration of whether Plaintiffs' evidence overcame the presumption in favor of Debtor receiving his discharge.

---

[1] All "ECF" references correspond to documents filed under the consolidated adversary caption in this case – Adv. No. 12-05027-CAG.
[2] "UST" denotes the United States Trustee's exhibits.
[3] Unless otherwise noted, all references are to Title 11, U.S.C. *et seq.*

The Robbins adversary proceeding seeks denial of Debtor's (also referred to as "Defendant" or "Croft") discharge under § 727(a). Specifically, Robbins as U.S. Trustee argues that Defendant falsified, omitted, or failed to disclose certain of his assets and additionally failed to disclose the transfer of assets to a trust that Defendant created to evade payment to creditors. As such, Robbins seeks denial of Debtor's discharge under § 727(a)(2)(A) for failing to disclose transfers to a trust; § 727(a)(2)(B) for concealment of cash and bank accounts; § 727(a)(3) for failure to keep or preserve books and records; § 727(a)(4)(A) for false schedules, statement of financial affairs, and false testimony; and § 727(a)(5) for failure to provide a satisfactory explanation for the loss or deficiency of assets.

The Lowry Plaintiffs also seek denial of Debtor's discharge on similar grounds under § 727(a)(2)-(5). Additionally, the Lowry Plaintiffs seek a denial of dischargeability of debt as to certain claims the Lowry Plaintiffs have against Defendant under 11 U.S.C. § 523(a)(6). The Lowry Plaintiffs have judgments against Defendant totaling $114,472.65 that arise out of court-ordered sanctions imposed on Defendant for initiating two state court lawsuits against the Lowry Plaintiffs. Defendant, through the assistance of others, or on his own, filed four state court actions against the Lowry Plaintiffs alleging irregular business practices and fraud. In each suit, after the Lowry Plaintiffs challenged the allegations in state court, Defendant, on his own or at his direction, dismissed the lawsuits. In two of the lawsuits, the Lowry Plaintiffs obtained sanctions against Defendant on the basis that the lawsuits were intended to harass, humiliate, and assert fraudulent claims against the Lowry Plaintiffs to damage their business reputation. The Lowry Plaintiffs argue that Defendant prosecuted these lawsuits against them in a willful and malicious manner, and, as such, are non-dischargeable under § 523(a)(6).

3

Additionally, Barbara Lowry ("Lowry") individually filed suit against Defendant and Kevin Stouwie, as Trustee of the Willawall Investments Trust, under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 (2010), for unlawfully posting Lowry's credit report on a web page that Defendant controls. Lowry argues that the posting of the credit report, and the public dissemination of Lowry's personal information, including her social security number, address, credit card numbers, was done with willful and malicious intent to injure Lowry both personally and professionally. The District Court, upon learning that the Lowry lawsuit contained many of the same allegations as contained in the Lowry Plaintiffs and Robbins lawsuits, referred the matter to this Court for trial.[4] Lowry and Defendant have consented to this Court issuing a final order as to damages and dischargeability; Stouwie has not.[5] Lowry seeks damages under the FCRA against Defendant and asks that those damages be deemed non-dischargeable under § 523(a)(6).

## FINDINGS OF FACT

### I.  The Trust

Defendant was the owner and founder of Willawall Investments, Inc. ("Willawall"), which incorporated Defendant's swimming pool maintenance business, Innovative Pool Solutions, in 2007. (UST – 012). On August 24, 2009, Defendant and his former wife, Cherie Jeffcoat, as grantors, created the Willawall Trust ("Trust") to hold their personal and business assets purportedly for the benefit of their minor daughter, naming Defendant as the sole trustee. (UST – 6). Within two years of filing for bankruptcy, Defendant and Jeffcoat transferred nearly all of their personal and business assets to the Trust for no consideration, including: 1) a quitclaim deed to real property and furnishings at 17914 Butte Hill, San Antonio, Texas ("Butte

---

[4] *See* Adv. No. 12-05114-CAG, ECF.  No. 1.
[5] As such, pursuant to the District Court's Order of Reference, the Court will issue a separate Report and Recommendation as to Stouwie's liability under the FCRA.

Hill Property"); 2) a 2008 Newell American Motor Home (the "Motor Home"); 3) a 2002 Ford Truck (the "Truck"); 4) a 2007 Honda Odyssey; 5) a Grand Junction Fifth Wheel Trailer (the "Trailer"); 6) stock in Willawall; 7) two Dell computers; and 8) $322,046.38 of funds.  (PL[6] – 156).  A third party, Richard Graf, also transferred a 1999 Honda van to the Trust.  During the time of these transfers, Defendant was involved in litigation with the Lowry Plaintiffs.  (PL – 126-130).

Defendant's friend, Richard Snell, participated in or handled many of the transactions and business dealings involving the Trust, either as co-trustee or as the sole trustee.[7]  Defendant appointed Snell as co-trustee of the Trust on June 10, 2010, apparently without ever resigning as trustee.  (D[8] – 12).  Conversely, Snell claimed that Defendant resigned as trustee before June 2010, but that he allowed Defendant to act as his agent and appointed Defendant as trustee for "specific purpose[s] . . . [m]aybe ten" times.  (UST – 112, at 26, 37-39).  Notably, Defendant signed several documents in May 2011, including a "Statement of Fact for a Trust" as trustee, in order to facilitate the sale of the Motor Home.  (PL – 131).  Snell also testified that he was not permitted to access the Trust's bank statements at Chase Bank, but only "looked at them online . . . with [Defendant] pulling them up."  (UST – 112, at 32-33).

Neither Defendant nor Snell appeared to understand fully the continuity of trustee appointments and resignations.  (UST – 112, at 26-54).  Defendant changed his testimony several times concerning his role as trustee, stating, "I don't ever remember completely resigning," and then responding to whether he resigned at the time of filing for bankruptcy, "I guess, yes." Defendant then appointed attorney Stouwie as co-trustee in November of 2011, a few weeks

---

[6] "PL" denotes the Lowry Plaintiffs' exhibits.
[7] Snell has never received a license to practice law, or received any professional license.  (UST – 112, at 11-12). Defendant knew of this fact.
[8] "D" denotes Defendant's Exhibits.

before Snell's death. Stouwie served as trustee until his resignation on July 18, 2012. (PL –
133).

### A. The Motor Home

On August 21, 2008, Defendant purchased the Motor Home for $265,000 to use for his
swimming pool business. (PL – 131). Defendant testified that the Motor Home was purchased
so that when he toured areas soliciting for his pool business, that he would have a place to live.
Defendant further explained that he was attempting to develop a portion of his business in
converting pools from chlorine purifiers to salt-based purifiers. Defendant financed the purchase
with a $225,000 loan from U.S. Bank, secured by a lien on the Motor Home. (PL – 131). On
November 25, 2009, U.S. Bank released its lien on the Motor Home, apparently in error, and on
December 8, 2009, Defendant transferred the Motor Home title to the Trust, absent the lien. (PL
– 131). Subsequently on May 4, 2011, Defendant, as trustee for the Trust, sold the Motor Home
for $189,290 to Ancira Motor Homes ("Ancira") without disclosing the lien. (PL – 157).[9]

Defendant then deposited the cashier's check from Ancira into a newly created Willawall
Trust account at Compass Bank on May 6, 2011, even though the Trust's prior accounts were
with JP Morgan Chase Bank. (UST – 77). By June 13, 2011, Defendant had withdrawn
$189,190.04 from the Compass Bank Account, including twenty withdrawals of $9,000 each
thereby, avoiding the $10,000 withdrawal limit which would have triggered a reporting
requirement under 31 U.S.C. §§ 5313(a) or 5325. (PL – 291). Defendant testified that in May
and June of 2011, he gave all of the withdrawn monies to Snell, whom Defendant characterized

---

[9] The Bank only learned of the lien's removal from the title certificate once Defendant filed for bankruptcy.
Defendant continued to make payments until the Bank sued to deny the discharge of Defendant's remaining debt on
the loan of $206,471.58. The Court denied the Bank's complaint because there was insufficient evidence to show
that Defendant injured the Bank with malicious intent or had a duty to disclose the bank's error in releasing the lien.
(PL – 131).

as an alcoholic and a drug addict.  In the midst of these withdrawals, Defendant enrolled in, and completed, a bankruptcy counseling course on June 10, 2011.  (UST – 121).

### B.  Universal K-9

Defendant used $166,000 of proceeds from the sale of the Motor Home to invest in and help form another business venture, Universal K-9, Inc. ("Universal K-9"), with Raymundo Nunez ("Nunez").  According to Nunez, Universal K-9 planned to acquire dogs with a valuable pedigree, train them to be guard dogs, and sell the dogs for a significant profit.  On July 5, 2011, Defendant helped Nunez file the Certificate of Formation to form a for-profit corporation, which lists Nunez as the president and owner of Universal K-9.  (UST – 019).  Notably, the certificate provides Defendant's mailbox address, not Nunez's, as Universal K-9's business address.  (UST – 019).  On September 23, 2011, the Trust, through Snell as trustee, entered into a joint venture agreement with Nunez and Universal K-9, in which the Trust would invest start-up capital of $166,000 and Nunez would train the dogs.  (D – 5); (PL – 160).[10]  According to the agreement, Universal K-9 and the Trust would each receive a 50 % interest in the venture and any profits.  (PL – 160).  Nunez testified that he knew little about Universal K-9's business affairs, and specifically, that he lacked awareness of a joint venture agreement or even that he was the registered owner and president of Universal K-9.

Defendant, along with Nunez and Snell, arranged to buy dogs from Jiri Hales, a guard dog breeder in the Czech Republic.  Defendant provided a bill from Universal K-9 to the Trust that quotes twelve dogs for a total purchase price of $144,000 in addition to $22,000 for labor, materials, and a one-year property lease, signed by Nunez as paid in cash.  (D – 8).  Another bill from Hales to Universal K-9 provides a $96,000 invoice for eight dogs.  (PL – 159).  Defendant

---

[10] The version submitted by Defendant (D – 5) is also signed by Richard Snell, but is dated September 23, 2012, months after Snell's death, and contains a different Trust address and place of business address.  Defendant testified that Richard Snell must have made these changes, the date being a typo.

also provided an email from Hales to Defendant, including a quote for ten dogs at $12,000 per dog, $11,500 for kennels and transport from the Czech Republic, less a $14,500 deposit. (D – 10). The Court heard several different versions regarding the acquisition, payment, and accounting of how the dogs were purchased.

First, Defendant testified that he gave Stan Schnitzer ("Schnitzer"), a family friend, $14,500 in cash to wire to Hales. (UST – 22). Defendant claims the $14,500 was merely a deposit, but Schnitzer, in his deposition, said that he believed the wire transfer paid for eight dogs. (UST – 23). Defendant testified that he delivered the money to Snell after every withdrawal, who delivered the money to Nunez, who then delivered the money to Hales. Snell claimed that he never received the money, but that Defendant either sent cashier's checks or wired the money to Hales. (UST – 112, at 114-115). Additionally, Nunez testified that he received a box of cash from Snell and handed it to Hales on September 24, 2011. Nunez testified that the box contained $96,000 in cash, but admitted that he never looked inside the box or saw the cash. (PL – 159).

On September 12, 2011, Defendant drove with Nunez to Houston and co-signed for eight dogs on the Continental Airlines Waybill. (UST – 24). Where the other four dogs came from, or even if there were four other dogs, is unclear. Nunez testified that Hales personally exchanged the first four dogs for the box of cash at Universal K-9's kennels. Schnitzer testified that he thought Universal K-9 received eight dogs for the $14,500 wire transfer. Snell, in his deposition, appeared to lack a clear understanding of the transaction and stated that Defendant either wired or paid with cashier's checks at least $100,000 for twelve dogs. (UST – 112, at 107-115). After being questioned thoroughly on the matter, Snell eventually deferred to Defendant's deposition by saying, "[t]rust him, just like me." (UST – 112, at 115).

8

Nunez testified that he immediately began training the dogs and that Snell delivered dog food and supplies to the training location.  In October 2011, approximately a month after receiving the dogs from Hales, Nunez received a letter from the Department of Public Safety informing him that Universal K-9 needed a license to manage a guard dog training business.  In response, Nunez ceased training the dogs, but continued to receive supplies from Snell to feed and exercise the dogs.  Following Snell's death in December 2011, Nunez contacted Defendant for business supplies until Universal K-9's funds dried up in July 2012.  Because Universal K-9 could not legally sell or train guard dogs without a license, Defendant gave the dogs away on Facebook and Craigslist.

According to Nunez, Craigslist forbids selling dogs on the site.  Nunez also testified that selling the dogs, even for a "small amount of profit," would expose the seller to liability.  By giving the dogs away and explaining the nature of the guard dogs to the new owners, Defendant shielded himself from such liability.  As a result of the foregoing, the only conclusive evidence that the Court has is that Defendant withdrew $166,000 from the Willawall Trust account; that Defendant gave some of the money to Snell, Schnitzer, Nunez, or Hales; and that between 8 and 12 dogs were purchased. Presently, no dogs, no cash, and no credible explanation of what happened to the $166,000 withdrawn by Defendant exist.

Following the failure of Universal K-9, Schnitzer formed Redonte, LLC ("Redonte") which assumed the name of Universal K-9 in March 2012.  (PL – 224).  Schnitzer anticipated that Nunez would be the dog trainer, but Redonte, like Universal K-9, first needed to obtain a license to train guard dogs.  (PL – 224).  Unfortunately, Nunez failed the "Qualified Manager's Exam" required by the Department of Public Safety for licensing.  (PL 224, at JBL1001564). Defendant then applied to be a manager of Redonte and attached to his application a certificate

9

of training in "Patrol Dog Explosive Detection" from the United States Air Force and a certificate of graduation in police training from the Federal Law Enforcement Training Center ("FLETC").  (PL – 224).  The Air Force Certificate was signed by a commander from a training wing that was no longer in existence on the date of signature.  (PL – 224, at JBL1001535).  Further, the FLETC custodian of records declared that the FLETC has no record of Defendant's certificate of graduation.  (UST – 111).  Redonte is not currently doing business and only owns one dog.

## II.  Disclosures

Between August 23, 2011 (the "Petition Date"), and February 17, 2012, Defendant filed four sets of schedules and three Statements of Financial Affairs ("SOFA").  In his first SOFA, Defendant stated that he had not transferred any assets within two years of the Petition Date.  (UST – 002).  In his first amended SOFA filed on August 29, 2011, Defendant stated that he transferred to the Trust the following property: (1) the remainder interest in the Butte Hill Property; (2) the Truck; (3) the Trailer; (4) the Motor Home; (5) a 1999 Honda Odyssey; and (6) a 2007 Honda Odyssey.  (UST – 003).  On his first and second Schedule B, Defendant listed the 2007 Acura MDX as his only vehicle.  (UST – 002, 003).  On his third Schedule B filed October 31, 2011, Defendant added the Trailer, the Motor Home, and the Truck.  (UST – 004).  On the following day, Defendant, as trustee for the Trust, placed a lien on the added vehicles, held by Defendant's friend Diane Santos in favor of Hales.[11]  (PL – 204-206).  On February 17, 2012, Defendant removed the Trailer, the Motor Home, and the Truck from his Schedule B, claiming the vehicles as trust property.  (UST – 004, 005).

---

[11] Hales released the lien on the Honda van on January 10, 2012, because Defendant totaled the car and received insurance money to replace the vehicle.  Santos continues to hold the lien.  (PL – 205).

Defendant claims that he did not include the vehicles in the first two schedules because on July 5, 2011, Defendant had transferred the vehicles to his former employee, Jose Contreras ("Contreras"). (UST – 018). According to Defendant, he sold Willawall Investments Inc. to Contreras for a future payment of $10,000. (UST – 018)[12]. Because Willawall, which belonged to the Trust, owned the vehicles, Defendant claimed that Contreras retained ownership. Willawall's business address, however, remained at Defendant's mailbox address, who continued to have sole authority over the Willawall Account and continued to make transfers from the Willawall Account to the Trust account. (UST – 018, 52-75). Defendant failed to disclose Willawall as his business or that he transferred Willawall to Contreras until listing it in his Final Amended Schedules. (UST – 002-005).

On August 8, 2011, Defendant transferred $5,000 in cash from the Trust account to the Willawall Account, and after filing bankruptcy, he continued to buy equipment and make transfers to the Trust account. (UST – 104). On August 25, 2011, the day Defendant filed his first schedules, he also deposited $961.68 into the Willawall Account, setting the account balance at $39,376.69. (UST – 104).

Defendant never listed Redonte or Universal K-9 on his bankruptcy schedules or SOFAs, which require Defendant to list any businesses in which he has been "an officer, director, partner, or managing executive of a corporation . . . either full- or part-time within six years immediately preceding the commencement of this case." (UST – 002-005). In addition to the $166,000 investment and other assistance Defendant provided to Universal K-9, Defendant helped Nunez prepare the Certificate of Formation and listed his mailbox address as Universal K-9's business address. Defendant also listed himself as "Operations Director" of Universal K-9 on his LinkedIn profile. (UST – 26). As noted above, Nunez testified that he did not have any

---

[12] It is unclear whether Contreras ever paid Defendant for the business and the vehicles.

knowledge of Universal K-9's business structure, including the fact that he purportedly owned the company. After Snell's death in December 2011, and until Defendant gave away the dogs around July 2012, Nunez received dog food and supplies from Defendant. Defendant also listed dogs on his schedules, amending the value from $5,000 to $2,000. (UST – 002-005).

Defendant did not disclose any cash transfers to the Trust in response to question #10 on any of his SOFAs, nor any cash on hand as of the Petition Date in response to question #1 on any of his Schedule Bs. (UST – 002-005). Furthermore, Defendant's disclosures of bank accounts have been inconsistent. In response to question #11 of the SOFA, which requires the debtor to list all financial accounts "closed, sold or otherwise transferred within one year" preceding filing, Defendant failed to list the Joint Account until his final disclosure in February 2013. (UST – 005). In response to question #14 of each of his SOFAs, which requires the debtor to list all property owned by another person that the debtor holds or controls, Defendant failed to disclose the Trust Account, the Compass Trust Account, and the Willawall Account. (UST – 002-005). As of the Petition Date, the Trust Account had a balance of $5,276.85, the Compass Trust Account had a balance of $73.12, and the Willawall Account had a balance of $38,414.81. (UST 75, Bank Account ending 8937); (UST – 77, Bank Account ending 6698); (UST – 104, Bank Account ending 8730). Additionally, Defendant disclosed an empty PayPal and Health Savings Account only on his Final Amended Schedule. (UST – 005).

Defendant initially answered that he received $3,000 from Innovative Pool Solutions in response to questions #1 and #2 of his SOFA, but corrected them on his first amended SOFA to show an estimated gross income of $16,000 for 2011, $19,440 (half of spouse's reported income) for 2010, and $22,531 for 2009. (UST 002-005). Defendant's 2009 Income Tax Return for Willawall notes $139,521 in gross receipts but negative $10,140 in taxable income, while

Defendant's 2010 Income Tax Return lists $77,606 in gross receipts but negative $13,764 in taxable income. (UST – 9, 10).

### III.  The Lowry Plaintiffs' Claims Under 11 U.S.C. § 523(a)(6)

Barbara Lowry has assisted in the management of 214 homeowner associations ("HOA") through her business, Association Management Services ("AMS"), since 1992.  According to Lowry's testimony, a property management company's integrity and reputation are important, and over the past 21 years, Lowry and AMS have developed a positive reputation and a measure of "good will" in the industry.  Defendant became involved in the property management business in 2009 and admittedly "undertook a course of action designed to expose Lowry's wrongdoing in the management of homeowner associations which would necessarily include a challenge to Lowry's integrity."  (Dist. Ct.[13] No. 41).  This course of action included negative Reliance webpage posts, disparaging emails to Lowry and the board members of Shavano Rogers Ranch Swim Club, Inc.  ("Shavano"), and four lawsuits, two of which resulted in sanctions against Defendant.  Lowry testified that she was personally and economically injured by Defendant's willful and malicious actions against her.

### A.  Reliance

In August 2009, Jeffcoat, who was married to Defendant at that time, incorporated Reliance with the stated purpose of operating a property management company.  (PL – 167). The Articles of Incorporation appointed Snell as the registered agent.  (PL – 167).  Jeffcoat has no training or experience in HOA management, and Jeffcoat testified that she did not have any involvement in Reliance aside from signing the incorporation documents at Defendant's request. Defendant purchased the "relianceam.com" and "hoapropertymanagementsanantonio.com" domain names and listed himself as the contact.  (PL –154).  On January 23, 2011, the Reliance

---

[13] All "Dist. Ct." references correspond to documents filed in *Lowry v. Croft, et al.*, SA-10-CV-0886, prior to the District Court's referral of the matter to this Court for trial.

web contact changed from Defendant to Jack Seyler, a friend of Defendant who died in 2002. (PL – 154, 168). Defendant retained control over the Reliance website, as evidenced by Defendant's negotiations with Lowry to take down the site and resolve potential lawsuits. (PL – 174, at JBL1000363). Defendant and Snell also sent emails to Lowry and the Shavano board members, accusing Lowry of fraud and mismanagement of funds. (PL – 174, at AMS100610, AMS100613).

From 2009 to 2010, Reliance published disparaging statements about Lowry, accusing Lowry and AMS of engaging in improper conduct. (PL – 161-166, 213-216, 231, 264). On July 21, 2010, Reliance posted on its website a local news video involving mismanagement of the Long Creek HOA as proof that Lowry "approved every bit of the dirty dealings going on with the Long Creek HOA." (PL – 161, at JBL1000301). On August 2, 2010, Reliance claimed on its webpage that the Long Creek HOA Board President resigned because the board uncovered a scam involving the Long Creek HOA president and Lowry stealing HOA funds, followed by a post with a photo of Lowry, captioned as a "MUG SHOT." (PL – 161, at JBL1000295-1000296). Defendant admitted that the photo was not a mug shot, and according to Lowry, Reliance acquired the photo from the AMS webpage.

On August 12, 2010, Reliance posted that "AMS/Barbara Lowry conspired to use the deposition [of *Richard Snell v. Spectrum Association Management, LP*] for a smear campaign to devert [sic] attention away from their problems of mismanagement, accounting irregularities, and lawsuits being filed against them," and that perjury is a "standard practice" of attorneys who represent AMS/Barbara Lowry. (PL – 161, at JBL1000294). On August 19, 2010, Reliance stated that Lowry "quit before being fired from the new" Long Creek HOA Board because she "always quits before being fired," and that her "gross mismanagement" and "less than truthful

14

ways" ended her relationship with the HOA.  (PL – 162, at JBL1000306).  On August 20, 2010, a Reliance blogger posted Lowry's Answer filed in one of the lawsuits initiated by Defendant and Snell, claiming that her plea to the jurisdiction was an evasive tactic to avoid answering questions about her mismanagement.  (PL – 162, at JBL1000305).  On August 29, 2010, Reliance claimed that Lowry "only cares about herself and that's it" which is "completely evident by [her] unwillingness to face litigation" and allowing her website design manager to do her "dirt work" and face litigation.  (PL – 162, at JBL1000303).  On December 28, 2010, a Reliance blogger stated that Lowry "disguise[d] the billing to drain" the money from HOAs.  On the same day, Reliance posted that Lowry and the Shavano Board retained a "Predator/Sex Offender like William 'Skip Merten'" on the board for the votes to keep Lowry "in control of managing and stealing money."  (PL – 165, JBL1001272).

Most notably, on October 10, 2010, a Reliance blogger posted Lowry's TransUnion credit report, which included her social security number, credit card numbers, and other personal information, on its public webpage to support the accusation that Lowry had been taking kickbacks in the form of gift cards.  (PL – 164).  This posting came just days after Lowry and Defendant engaged in failed settlement negotiations wherein Defendant asserted that he had control over the Reliance website.  (PL – 174).  Reliance claimed that the credit report proved Lowry did not have the credit card ending in 6425 used to purchase the gift cards.  (PL – 164).  On October 11, 2010, one day after Lowry's credit report appeared on the Reliance website, Defendant sent Lowry an email stating:

> I'll have you and others know that it is our intention to parade you and whoever else stands behind you in front of the TV cameras until you get exactly what you deserve.  I saw your credit report and as the whole world can see now you never in your life owned a Citi Bank Mastercard with the last digits 6425.

(PL – 174, AMS100613-100614). Lowry, in fact, owns this credit card and testified that she purchased the gift cards to keep track of payments to AMS employees. (PL – 297).

CitiBank initially requested and received the report from TransUnion Bank on June 11, 2010. (PL – 152, Deposition at 85, 89). How Defendant obtained the credit report from Citibank or another third party is unclear, but Defendant did post the credit report. In Croft's First Amended Answer to the Complaint in the District Court case, he states that the "[r]eport was obtained for a legitimate business purpose; whether or not it was permissible under the FCRA is to be determined." (Dist. Ct. No. 41). In the present case, Defendant testified that he knows the FCRA prohibits people from disclosing credit information and that such a disclosure is the type of information that most people want to keep private because it could be used for a harmful, improper purpose. According to Jeffcoat, Defendant exclaimed, "I got her now" once Snell and Defendant obtained Lowry's consumer report.

Lowry filed a lawsuit in the United States District Court for the Western District of Texas in San Antonio against Defendant, Snell, Jeffcoat, and Reliance on November 1, 2011, for the unlawful posting of her credit report in violation of the FCRA. (Dist. Ct. No. 1). The District Court entered a default judgment against Reliance, awarding Lowry $115,000 in damages and $25,000 in attorney fees. (Dist. Ct. No. 22). The District Court referred the claims against Defendant for final adjudication by this Court, and the claims against Stouwie for a report and recommendation. (Dist. Ct. No. 83).[14]

### B. Sanctions - Cause No. 2010-CI-09853; Cause No. 2009-CI-15857

Between September 28, 2009, and January 21, 2011, Defendant was a plaintiff in four lawsuits against Lowry and AMS. (PL – 127-130). In two of the lawsuits, Defendant alleged

---

[14] Although Defendant and Lowry have consented to final adjudication in the Bankruptcy Court, Stouwie has not responded. (Dist. Ct. No. 83). Snell, due to his death, and Jeffcoat have been dismissed from the FCRA case.

that Lowry and AMS had engaged in "accounting irregularities, fraudulent management practices, money laundering, kickbacks concerning contracts with vendors, commingling and misappropriation of funds." (PL – 127, 128).  The state district court dismissed the first of these lawsuits, initiated on December 21, 2009, for want of jurisdiction.  (PL – 127).  Defendant non-suited the following case, initiated on January 13, 2010, after AMS moved again to dismiss for want of jurisdiction.  (PL – 128).  In a mandamus proceeding, initiated on September 28, 2009, Defendant (as plaintiff in the state court case) sought AMS's business records, and after Defendant non-suited the case in March of 2011, the court granted a motion for sanctions, ordering Defendant, individually, to pay AMS $4,000 for the "inconvenience, harassment, and out-of-pocket expenses" caused by the litigation and $5,000 in attorney's fees.  (PL – 129).

Defendant filed a fourth state court suit in his capacity as Trustee for the Willawall Investments Trust on June 14, 2010.  In that suit, Defendant claimed AMS had engaged in "potential money laundering and kickbacks between AMS and its pool contractor, including the use of gift cards to purchase supplies for the Swim Club for which AMS was reimbursed." (PL – 130).  Defendant non-suited the case shortly before a hearing on Lowry's motion to dismiss.  (PL – 130).  Nonetheless, the court granted $82,918.12 in sanctions against Defendant in his individual capacity and as Trustee of the Willawall Trust in favor of Shavano and its board members, and $22,554.53 in favor of AMS.  (PL – 130).

### THE PARTIES' CONTENTIONS

#### A.  11 U.S.C. § 523(a)(6)

The Lowry Plaintiffs contend that Defendant is not entitled to a discharge of debts resulting from any FCRA claim or sanctions awarded to the Lowry Plaintiffs in previous lawsuits.  Lowry alleges that Defendant acted maliciously and intentionally, either on his own or

in a conspiracy with Reliance, Snell, and the Trust; to injure Lowry by posting her credit report. Lowry also contends that the "cumulative weight of [Defendant's] lawsuits and Reliance's denunciations" indicate a malicious intent to cause Lowry injury. After the posting of her credit report, Lowry testified that she had to replace all of her credit cards, receive medication for stress and emotional pain, that her business reputation had been damaged by the webpage postings, especially the posting of her credit report; and that the excessive litigation has kept Lowry from working full-time, slowing down AMS business.

Lowry contends that Defendant, Snell, and Reliance obtained Lowry's credit report without a lawful basis, and that their actions were the proximate cause of her damages. Lowry claims that Reliance's webpage and Defendant's telephone conversation with Jeffcoat illustrate Defendant's improper purpose in posting Lowry's consumer report. Defendant denies "commencing a campaign to discredit Lowry in the sense the allegation implies wrongdoing." (Dist. Ct. No. 41). Lowry also alleges that the Trust assisted Defendant, Snell, and Reliance in violating the FCRA by allowing them access and use of the Trust computers, residence, and internet access to post Lowry's credit report.

Defendant responds that he did not obtain Lowry's credit report in violation of the Fair Credit Reporting Act, and that Snell posted the credit report. Defendant also contends that Lowry did not suffer injury or any actual or emotional damages as a result of the actions of Defendant, Reliance, and Snell. Defendant contends that he did not obtain the consumer report in violation of the FCRA because it was obtained for a legitimate business purpose via lawful means. (Dist. Ct. No. 41). Finally, Defendant contends that the FCRA does not apply because Defendant is not a credit reporting agency, nor was the Report used in a credit transaction. (Dist. Ct. No. 41).

### B.  11 U.S.C. § 727(a)(2)

Plaintiffs contend that Defendant is not entitled to a discharge of his debts because he transferred and concealed assets with an intent to defraud Plaintiffs.  First, Plaintiffs allege that Defendant made the Trust his alter ego by transferring nearly all of his assets to the Trust, and through his sole authority over trust funds, used the Trust for his own benefit.  Defendant contends that most of the expenses were for the sole benefit of his daughter, and any other expenses were investments for the Trust or compensation for performing trustee duties, as provided in the Trust Agreement.

Second, Plaintiffs allege that Defendant sought to hinder, delay, and defraud creditors and the Chapter 7 Trustee through the concealment of cash on hand and bank accounts. Plaintiffs assert that Defendant failed to disclose any cash on hand in his SOFAs and Schedules, and with the exception of the eventual disclosure of the closed Joint Account and the empty Health Savings and PayPal accounts, Defendant failed to disclose any bank accounts under his control.

Third, Plaintiffs allege that Defendant attempted to conceal cash and bank accounts through a scheme to convert the proceeds from the sale of the previously encumbered Motor Home into cash.  The Plaintiffs contend that the suspicious release of the lien, the twenty $9,000 withdrawals from Compass Bank, and the bizarre and uncertain circumstances surrounding the creation and dissolution of Universal K-9 indicate that Defendant caused a sham corporation to be created in order to conceal the $189,290 gained from the May 2011 Motor Home sale. Plaintiffs allege that the timing of the transactions is particularly relevant because the sale took place three months prior to Defendant's filing for bankruptcy, and the purchase of dogs occurred about a month following the filing.  Plaintiffs also note the ongoing litigation with the Lowry

Plaintiffs and that Defendant placed the cash proceeds from the Motor Home sale in a Compass Bank Account rather than the Chase Trust Account. Defendant responds that he had no knowledge of a $10,000 rule but merely withdrew as much as he thought the bank would let him. Defendant contends that Universal K-9 was a legitimate trust investment, and that after Defendant gave Snell the $166,000, Snell handled any further business matters. Defendant also claims that the "vast majority of the debts included in Defendant's bankruptcy were not incurred until after March 8, 2012, when his spouse filed for divorce." (ECF No. 59).

Furthermore, Plaintiffs submitted an email from Snell to Jeffcoat's divorce attorney, sent three days prior to Snell's death, stating that Defendant: 1) forged the document from U.S. Bank to release the lien on the Motor Home; 2) "continued to make payments to the bank" to prevent alerting U.S. Bank to the Motor Home's sale to Ancira; 3) never spent money on guard dogs but concealed the cash received for the Motor Home; 4) "used the Trust as his own personal account"; 5) filed for bankruptcy to "stop the support payments to [Jeffcoat]"; 6) "took [Jeffcoat] by the throat and threatened to beat her if she refused to sign" the quitclaim deed on the Butte Hill Property; and 7) "fraudulently set up the trust." (PL – 229).

Defendant responds that Jeffcoat, or another interested party, could have used Snell's email address to forge this email. Plaintiffs contend that the mostly confidential facts in the email, the contrite tone of the email, and its proximity to Snell's death indicate the email's authenticity.

### C. 11 U.S.C. § 727(a)(3)

Additionally, Plaintiffs contend that Defendant's debts are not dischargeable because Defendant unjustifiably concealed, falsified, or failed to keep or preserve documentation of his financial condition and business transactions. Plaintiffs allege that Defendant has failed to

provide sufficient records of his financial condition, or of the Trust, his alleged alter ego. Plaintiffs contend that Defendant's pool business accrued significant revenues, and that Defendant failed to produce a financial record of the business and falsified tax returns for the previous three years. Defendant responds that the tax returns indicate Willawall's financial struggles, and that Jeffcoat deposited the majority of Trust funds.

Regarding Universal K-9, Plaintiffs contend that there is no actual record of the sum of money paid for the dogs purchased from Hales or otherwise. Plaintiffs also contend that the number of dogs purchased is unclear. This, the Plaintiffs contend, is supported by the witnesses' conflicting testimony. Defendant responds that Snell handled the Universal K-9 business, as Trustee, with Nunez, and that the invoices for the dogs, the kennels, and the wire transfer, are sufficient records of the business.

### D.  11 U.S.C. § 727(a)(4)

Plaintiffs contend that Defendant is not entitled to a discharge of his debts because he knowingly and fraudulently made numerous false oaths and showed "reckless indifference to the truth" through false, evasive, or conflicting testimony in his Schedules and SOFAs, his deposition, the § 341 meeting, and as a witness at trial. Plaintiffs contend that Defendant had numerous opportunities to be truthful between August 23, 2011, and February 17, 2012. Defendant responds that he made a good faith effort to provide accurate information, and that any inaccuracies in his filings were due to honest mistakes and bad representation by Snell, which Defendant corrected by hiring legal counsel to file his final amendments. Plaintiffs also note that Defendant knew, at the time he filed for bankruptcy, that Snell was not an attorney.

Plaintiffs also cite to Defendant changing his Schedules about the ownership of vehicles, and the cash transfers to the Trust of $152,005.69 over the past year and $322,046.38 in the past

two years.  Defendant contends that his first amended SOFA disclosed the vehicle transfers to the Trust in response to question #10.  In spite of Defendant's acknowledgement that he made all of the transfers from the Joint Account to the Trust Account, Defendant additionally avers that he did not disclose any cash transfers to the Trust because he believed that his spouse made all of the deposits.

### E.  11 U.S.C. § 727(a)(5)

Plaintiffs contend that Defendant has failed to explain satisfactorily the loss of assets or deficiency of assets to meet his liabilities.  First, Defendant has not explained why he has transferred nearly all of his assets but none of his debts to the Trust.  Second, Defendant has not explained why he encumbered three of the vehicles in the Trust with liens in favor of Hales.  Third, Defendant has not explained his transfer of the remainder interest in his residence to the trust while retaining a life estate.  Finally, Defendant has failed to explain why he did not use the proceeds from the Motor Home sale to repay his debt to U.S. Bank.  Rather than respond directly to these allegations, Defendant contends that the accumulation of attorneys' fees and the failure of the Trust businesses, Willawall and Universal K-9, have forced Defendant into bankruptcy.

## ANALYSIS

### I.    Lowry's FCRA Claims

As an initial matter, the Court will first address whether Defendant violated the FCRA and whether any damages should be awarded that would become a debt in the underlying bankruptcy case.  The Court finds that Defendant willfully violated the FCRA by purposefully posting Lowry's credit report on the Reliance website without any permissible purpose for doing so.  The Court also finds that the Lowry is entitled to statutory damages in the amount of

$1,000.00 and to punitive damages in the amount of $75,000.00. Additionally, the Court awards reasonable attorneys' fees and costs to Lowry.

The purpose of the FCRA is "to ensure fair and accurate credit reporting, promote efficiency in the banking systems, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007) (citing 84 Stat. 1128, 15 U.S.C. § 1681 and *TRW Inc. v. Andrews*, 534 U.S. 19, 23 (2001)). "By enacting the FCRA, Congress intended to prevent invasions of consumers' privacy." *Zamora v. Valley Fed. Sav. & Loan Assoc. of Grand Junction*, 811 F.2d 1368, 1370 (10th Cir. 1987) (citations omitted). The FCRA provides broad protection to consumers by prohibiting any person from using or obtaining a consumer report for any reason other than permissible purposes. *See* 15 U.S.C. § 1681b(f).[15] A negligent or willful violation of the FCRA may result in liability to the consumer for actual damages as well as attorneys' fees and costs. *See* 15 U.S.C. § 1681n-o. Additionally, the FCRA permits a court to impose punitive damages for a willful violation of any provision of the FCRA. *See* 15 U.S.C. § 1681n(a)(2).

### A. Defendant violated Section 1681b(f) of the FCRA.

Section 1681b(f) of the FCRA provides:

> A person shall not use or obtain a consumer report for any purpose unless
> (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
> (2) the purpose is certified in accordance with [§1681e] by a prospective user of the report through a general or specific certification.

---

[15] The original version of the Fair Credit Reporting Act passed in 1970 did not explicitly impose a duty on users of consumer reports from requesting or using the consumer reports without a permissible purpose. *See Phillips v. Grendahl*, 312 F.3d 357, 363 (8th Cir. 2002) (citing 15 U.S.C. § 1681b (1994)) *abrogated on other grounds by Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). The FCRA was amended in 1996 to add § 1681b(f) which now prohibits such users from impermissibly obtaining or using consumer reports. *Id.*; 15 U.S.C. § 1681b(f).

15 U.S.C. § 1681b(f).  To prevail under § 1681b(f) of the FCRA, a plaintiff must show: (1) that the document at issue is a "consumer report"; (2) that the defendant "used or obtained" the consumer report; and (3) that the defendant did not have a permissible statutory purpose for obtaining the consumer report.  *Phillips v. Grendahl*, 312 F.3d 357, 365-67 (8th Cir. 2002) *abrogated on other grounds by Safeco*, 551 U.S. 47; *Norman v. Lyons*, 3:12-CV-4294-B, 2013 WL 655058, at *2 (N.D. Tex. February 22, 2013).  Additionally, the plaintiff must show that the defendant acted either negligently or willfully in order to impose civil liability under the FCRA. 15 U.S.C. § 1681n-o; *see also Phillips*, 312 F.3d at 365-67; *Norman*, 2013 WL at *2.

    *1.  The TransUnion Report posted on the Reliance Website is a "consumer report."*

The Court finds that the report posted to the Reliance website is Plaintiff Lowry's TransUnion credit report and that such report is a "consumer report" under § 1681a(d) of the FCRA.  The FCRA defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . credit or insurance . . . employment purposes . . . or any other purpose authorized under § 1681b." 15 U.S.C. § 1681a(d).  Courts also require that a report be disclosed to a third party in order to be classified as a "consumer report."  *See Norman*, 2013 WL at *2 (citing *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004) *abrogated on other grounds by Safeco*, 551 U.S. 47; *Scharpf v. AIG Mktg., Inc.*, 242 F. Supp. 2d 455, 458 (W.D. Ky. 2003); *Renniger v. Chexsystems*, 1998 WL 295497, at *5 (N.D. Ill. May 22, 1998)).

There is no question that a TransUnion credit report satisfies the definition of a "consumer report" within the meaning of the FCRA. First, it is well established, and the parties do not dispute, that TransUnion, LLC is a "consumer reporting agency" under the FCRA. *See* 15 U.S.C. § 1681a(f); *see e.g., Myers v. Bennett Law Offices*, 238 F. Supp. 2d 1196, 1201 (D. Nev. 2002). Second, the TransUnion credit report is a written communication bearing on the consumer – Lowry's – credit worthiness, standing, capacity, character, reputation, personal characteristics and mode of living that would normally be used or collected to serve as a factor in establishing eligibility for extension of credit, employment, or another authorized purpose under § 1681b. 15 U.S.C. § 1681a(d). Lastly, the TransUnion credit report was disclosed to an unknown number of third parties after TransUnion first provided the credit report to the Citibank Entity (PL – 152, at 30), and again upon its being posted on the Reliance website. (PL – 164). As such, the Court finds that Lowry's TransUnion credit report is a "consumer report" thereby satisfying the first element of the FCRA claim.

    *2. Defendant "used or obtained" Lowry's consumer report.*

The second element of the FCRA claim is met in two ways as the Court finds that Defendant both obtained and used Lowry's TransUnion credit report. Although the Plaintiffs need only show that Defendant either obtained *or* used Lowry's consumer report, the Court finds upon consideration of the pleadings and evidence that Defendant completed both these actions.

First, during the trial, this Court found that Defendant admitted to obtaining Lowry's consumer report in his First Amended Answer filed in this case on August 24, 2011. (Dist. Ct. No. 41). The Court confirms its previous finding in this opinion. In her Original Complaint filed on November 1, 2010, Lowry alleged the following in Paragraph 25: "The actual purposes for which Lowry's consumer report was obtained was not an authorized purpose for obtaining a

25

consumer report." (Dist. Ct. No. 1).  On August 24, 2011, Defendant filed "Croft's First Amended Answer" which states in Paragraph 4: "The following numbered paragraphs are admitted in part and denied in part as follows: … (d) ¶ 25 – The Report was obtained for a legitimate business purpose; whether or not it was permissible under the FCRA is to be determined." (Dist. Ct. No. 41).

Plaintiff argues that this paragraph of Defendant's Answer is an admission that Defendant obtained Lowry's consumer report.  Defendant argues that Paragraph 4 of the Amended Answer is not an admission of obtaining the consumer report himself but rather, it is merely a statement that the purpose for obtaining the report was a legitimate business purpose.  To support this interpretation of the Amended Answer, Defendant points to Paragraph 1 of the Amended Answer which states in part: "… (b) Croft did not directly obtain the Report…" as his denial that he obtained Lowry's consumer report.

The Court finds that Defendant's reading of his assertions in the Amended Answer is untenable.  First, the fact that this Amended Answer is filed by Croft alone, and not in conjunction with any of the other named defendants, suggests that any admissions within the Answer are admissions of Defendant's own actions.  Therefore, Defendant's statement in Paragraph 4 is properly read as an admission that Defendant obtained Lowry's consumer report.  Additionally, Defendant's assertion in Paragraph 1 that he "did not directly obtain the Report" only serves to bolster the admission that he did actually obtain it – albeit indirectly.[16]  Therefore,

---

[16] Although it is unclear how Defendant obtained the report or who he indirectly obtained the report through, the fact that Defendant did not obtain the report from TransUnion directly does not relieve him from liability under § 1681b(f) of the FCRA.  *See Phillips*, 312 F.3d at 367 (Defendant was not relieved of potential liability under the FCRA simply because a private investigator ordered the report.); *see also Myers*, 238 F. Supp. 2d at 1201 ("The Court is not aware of statute or case law that suggests the transfer has to be directly from the consumer reporting agency to the end user to form liability under the FCRA.").

the Court confirms its previous ruling that Defendant admitted to obtaining Lowry's consumer report.

Second, even had Defendant not admitted to obtaining Lowry's consumer report, the Court finds that Defendant used Lowry's consumer report on the Reliance website. Although mere passive receipt of a consumer report is insufficient to establish liability under the FCRA, a defendant will be in violation of the FCRA if he uses a consumer report, however obtained, without a permissible purpose. *See MacFarland v. Bob Saks Toyota, Inc.*, 466 F. Supp. 2d 855, 867 (E.D. Mich. 2006); *see also Raymond v. Raymond*, No. 03 C 9150, 2005 WL 2491442, at *3 (N.D. Ill. October 7, 2005) ("Section 1681b(f) uses 'obtain' and 'use' in the disjunctive, thus . . . [the plaintiff] must only prove one of these actions to hold defendants liable.").

The Court finds that Defendant is the person who posted Lowry's consumer report on the Reliance website. Defendant was the registered contact for the Reliance website at the time that Lowry's consumer report was posted on October 10, 2010. (PL – 154, 164). Additionally, Defendant retained control of the website as evidenced by his attempt to use such control as a bargaining chip in negotiations with Lowry to resolve several lawsuits. (PL – 174). Further, Lowry's consumer report was posted on the Reliance website just days after these attempts at settlement failed. (PL – 164, 174). Lastly, Defendant's acknowledgment in his October 11, 2010, email to Lowry that he had seen the credit report on the website coupled with his asserted control over the website demands a conclusion that Defendant posted the consumer report to the Reliance website. (PL – 174). By posting Lowry's consumer report on the Reliance website, Defendant "used" Lowry's consumer report, thereby satisfying the second element of the Plaintiff's FCRA claim.

3. *Defendant lacked a statutorily permissible purpose for obtaining or using Lowry's consumer report.*

An exclusive list of permissible purposes is provided in § 1681b(a). The most commonly invoked permissible purposes for obtaining information in a consumer report are: (1) pursuant to a court order or subpoena, § 1681b(a)(1); (2) pursuant to written instructions of the consumer, § 1681b(a)(2); (3) in connection with a credit transaction for extension of credit or review and collection of an account, § 1681b(a)(3)(A)&(E); or (4) for employment purposes, § 1681b(a)(3)(B). Additionally, the FCRA allows use of a consumer report for a legitimate business need either "in connection with a business transaction that is initiated by the consumer" or "to review an account to determine whether the consumer continues to meet the terms of the account." § 1681b(a)(3)(F).

The Court finds that Defendant did not have a permissible purpose under § 1681b(a) to obtain or use Lowry's credit report. Investigating a consumer in an attempt to expose alleged wrongdoings without a court order or without written permission of the consumer is not a permissible purpose for obtaining or using a consumer report under the FCRA. Likewise, posting a consumer report on the internet for all to see in an effort to expose perceived wrongdoings is not a permissible purpose for using a consumer report under the FCRA. Defendant asserts that he had a legitimate business purpose for using Lowry's consumer report. The Court does not agree. The only legitimate business purposes that are permissible under § 1681b(a)(3)(F) are in connection with a business transaction initiated by the consumer or in reviewing an existing account for continued compliance with its terms. Defendant cannot assert either of these permissible legitimate business needs because Lowry has not initiated a business transaction with Defendant nor does she have an existing account with him.

28

Even a person with the purest intentions in exposing actual wrongdoing will be held in violation of the FCRA if he posts a consumer report on the internet without a permissible purpose. That scenario is far from the case here. As such, Defendant's posting of Lowry's consumer report on the Reliance website in an attempt to expose alleged wrongdoing is not a permissible purpose under § 1681b(a). Therefore, the Court finds that Defendant violated § 1681b(f) of the FCRA when he obtained and posted Lowry's consumer report on the Reliance website without a permissible purpose for doing so.

### B.  Defendant's violation of the FCRA was willful.

To establish willful noncompliance with the FCRA, the plaintiff must prove that the defendant "'knowingly and intentionally committed an act in conscious disregard for the rights of others.'" *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986)). The plaintiff need not show malice or evil motive in order to satisfy § 1681n. *Stevenson*, 987 F.2d at 293 (citing *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983)). Rather, reckless disregard of an FCRA requirement is enough to qualify as a willful violation under § 1681n. *Safeco*, 551 U.S. at 71.

The Court finds that Defendant's violation of the FCRA was willful. Defendant acted knowingly and intentionally in conscious disregard of Lowry's rights. Lowry had a right under the FCRA not to have her consumer report with all its deeply personal and confidential information posted and maintained on the internet for all to see. Defendant knew that the FCRA prohibited his actions and knew that disclosure of this type of information for an improper purpose could be harmful to the Plaintiff. In the face of this knowledge, Defendant chose to post Lowry's consumer report and use it in retaliation for failed settlement attempts with Lowry. Defendant's actions were not an accident or the consequence of an oversight such that his

violation could be deemed negligent or unintentional. *See e.g.*, **Cousin v. Trans Union Corp.**, 246 F.3d 359, 372-75 (5th Cir. 2001) (comparing willful violations such as intentional misrepresentation or concealment with violations as a result of procedural failures which are merely negligent). Rather, Defendant obtained and used Lowry's consumer report with deliberate and pointed resolve in his continuing and relentless attempts to discredit Lowry and AMS.

### C. Damages

Under § 1681n(a) of the FCRA, any person who "willfully fails to comply with any requirement imposed" by the FCRA "with respect to any consumer" will be held liable to that consumer for the following: (1) actual damages sustained by the consumer as a result of the failure *or* statutory damages of at least $100 and not more than $1,000; (2) punitive damages as allowed by the court; and (3) costs of the action together with reasonable attorney's fees. The Court finds that Lowry is entitled to statutory damages in the amount of $1,000, punitive damages in the amount of $75,000, and costs of the action together with reasonable attorney's fees.

#### 1. *Actual Damages*

Lowry asserts that she suffered actual damages comprised of $150,000 of economic damages and $10,000 of emotional damages. In order to recover actual damages, a plaintiff has the burden to prove that an actual loss has been sustained. *See **Larson v. Groos Bank, N.A.**, 204 B.R. 500, 502 (W.D. Tex. 1996). Claims of emotional distress require "specific information" concerning the damages and may not rely on only "generalized assertions" in order to sustain an award. **In re Repine**, 536 F.3d 512, 521-22 (5th Cir. 2008); *see also **Cousin**, 246 F.3d at 370-71. An award for emotional distress "must be supported by evidence of genuine injury, such as

evidence of the injured party's conduct and the observations of others." *Cousin*, 246 F.3d at 371

(citing *Carey v. Piphus*, 435 U.S. 247, 264 (1978)). In *Cousin*, the court held that the plaintiff's

own testimony was legally insufficient to establish emotional damages but that the claim must be

proved "with a degree of specificity which may include corroborating testimony or medical or

psychological evidence in support of the award." *Id.* Damages for emotional distress have been

awarded where the plaintiff provided evidence of denial of credit, embarrassment from being

required to detail problems to business associates and creditors, and the expenditure of a

considerable amount of time attempting to resolve the credit dispute. *See Stevenson*, 987 F.2d at

296-97.

  The Court finds that the Plaintiff has not met its burden to prove either economic or

emotional damages. Although the Plaintiff testified that she expended time to manage the

exposure of her credit report, no evidence was presented as to the quantity of time lost or the

value of that time. Additionally, there is no evidence that the Plaintiff has experienced any

adverse credit consequences due to the exposure of her credit report. To her credit, the Plaintiff

acted swiftly to mitigate any damage that could have occurred. As a result, the Court does not

find there is sufficient evidence in the record to award economic damages. Likewise, the Court

also finds, there is insufficient evidence to award emotional damages. The Plaintiff testified that

she was humiliated and embarrassed from the posting of her credit report. Although the Plaintiff

also testified that she has seen a doctor and been treated for sleeplessness, no medical records or

testimony was provided. Rather, the Plaintiff relies solely on her own testimony to establish

emotional damages. The evidence offered does not reach the degree of specificity required to

award emotional damages but relies heavily on "generalized assertions." *See Repine*, 536 F.3d

at 521-22; *see also Cousin*, 246 F.3d at 370-71.  Therefore, the Court finds that the Plaintiff has not met its burden of proving actual damages.

    *2.  Statutory Damages*

    As an alternative to actual damages, a plaintiff seeking damages under § 1681n is entitled to statutory damages of not less than $100 and not more than $1,000 where the defendant willfully failed to comply with the FCRA.  *See Ramirez v. Midwest Airlines, Inc.*, 537 F. Supp. 2d 1161, 1168-69 (D. Kan.  2008) (no requirement to prove actual damages in order to recover statutory damages under the FCRA); *see also Ashby v. Farmers Ins. Co. of Or.*, 592 F. Supp. 2d 1307, 1317 (D. Or.  2008).  Although the statute does not provide specific criteria by which the fact-finder should evaluate the appropriate award, the statute clearly defines what conduct is prohibited and provides notice to the defendant of the potential narrow range of statutory liability for willful noncompliance.  *See In re Farmers Ins. Co. Inc., FCRA Litigation*, 738 F. Supp. 2d 1180, 1223-24 (W.D. Okla.  2010).

    The Court finds that a maximum award of statutory damages is appropriate in this case. Where the quantifiable injury to the Plaintiff is difficult to prove yet the violation is so egregious and malicious, the maximum award of statutory damages is appropriate to compensate the Plaintiff for harm to her reputation, her security, and her loss of time.  Defendant's actions were taken with deliberate intent to cause as much harm as possible to the Plaintiff.  As such, the Court finds that an award of the statutory maximum of $1,000 to the Plaintiff is warranted.

    *3.  Punitive Damages*

    The Court finds that an award of $75,000 in punitive damages is appropriate under the circumstances to achieve the goals of punishing Defendant for his willful violation of the FCRA and deterring Defendant from engaging in the prohibited conduct in the future.  The Supreme

Court has held that punitive damages may be imposed in order to further "legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 568 (1996). As such, punitive damages may be awarded even in the absence of actual damages in order to serve the underlying deterrent purpose of the FCRA. *Saunders v. Branch Banking & Trust Co of Va.*, 526 F.3d 142, 152 (4th Cir. 2008). The amount of a punitive damages award is limited by the Due Process Clause which "prohibits the imposition of grossly excessive or arbitrary punishments." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). In determining the amount of punitive damages to award, the Supreme Court instructs courts to "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." *Id.* at 418.

The first guidepost – the degree of reprehensibility of the defendant's misconduct – requires the Court to evaluate the defendant's conduct based on the following factors: (1) whether the harm was physical or economic; (2) whether the tortious conduct evinced a reckless disregard for the health and safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit rather than mere accident. *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-77). In this case, the harm to the Plaintiff was economic and emotional in nature. Although violations of the FCRA rarely result in physical harm or involve the health and safety of others, Congress nonetheless authorized the award of punitive damages for FCRA violations. Therefore, the first two factors do not weigh strongly against an award of punitive damages. *See Saunders*, 526 F.3d at 152-53

(citing *Gore*, 517 U.S. at 583). The third factor weighs in favor of an award of punitive damages as the Plaintiff in this case was financially vulnerable because she derives her income from her own business that Defendant repeatedly attacked by attempting to disparage her own credibility. The fourth and fifth factors also weigh in favor of an award of punitive damages because Defendant's violation was not an isolated incident but rather an intentional and malicious violation in a long line of harassing and disparaging behavior.

The second guidepost requires the Court to consider the amount of actual or potential harm suffered in relation to the amount of punitive damages awarded. In this case, the ratio of statutory damages awarded to punitive damages is 1:75. Although awards larger than a single digit ratio generally raise constitutional concerns, a ratio of this amount is necessary to achieve the underlying purpose of a punitive award – to punish and deter the defendant. *See Abner v. Kan. City S. R.R.*, 513 F.3d 154, 165 (5th Cir. 2008); *see also*, *Saunders*, 526 F.3d at 153-54.

The third and final guidepost requires the Court to determine the difference between the punitive award and the civil penalties authorized or imposed in comparable cases. This guidepost is inapplicable to private suits authorized under the FCRA because, unlike suits brought under the FCRA by the government, Congress specifically chose not to limit the amount of punitive damages that may be imposed.[17] *See Saunders*, 526 F.3d at 152; *see also Bach v. First Union Nat. Bank*, 486 F.3d 150, 154 n.1 (6th Cir. 2007) ("The third factor provided little assistance in this case, because the FCRA does not include a limit on damages for civil actions brought under the statute by private citizens.").

In examining the three guideposts and factors required by Due Process considerations, this Court finds that $75,000 is an appropriate award of punitive damages to serve the FCRA's goals of punishment and deterrence and is within the limits of the Due Process Clause.

---

[17] *See* §§ 1681s(a)(2)(A) & (c)(1)(B)(iii).

### 4. *Attorney's Fees and Costs*

In accordance with its finding of Defendant's willful violation of the FCRA, the Court also finds that the Plaintiff is entitled to recover the costs of this action together with reasonable attorney's fees. *See* 15 U.S.C. § 1681n(a)(3). The amount of attorney's fees and costs shall be determined upon Plaintiff's application to the Court pursuant to Fed. R. Civ. P. 54, Fed. R. Bankr. P. 7054, and Local Rule 7054.

## II.  Non-Dischargeability Under 11 U.S.C. § 727

11 U.S.C. § 727 states:

(a)  The court shall grant the debtor a discharge, unless—

    (2)  the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed—

        (A)  property of the debtor, within one year before the date of the filing of the petition; or

        (B)  property of the estate, after the date of the filing of the petition;

    (3)  the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

    (4)  the debtor knowingly and fraudulently, in or in connection with the case—

        (A)  made a false oath or account;

        (B)  presented or used a false claim;

        (C)  gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

        (D)  withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

    (5)  the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;—

    (7)  the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the

filing of the petition, or during the case, in connection with another case under this title or under the Bankruptcy Act, concerning an insider.

Plaintiffs object to the granting of a discharge of Defendant pursuant to §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4)(A), and 727(a)(5).  11 U.S.C. § 727(a) provides that a court must grant a discharge unless one or more grounds for denial of discharge under § 727(a)(1)-(12) is proven to exist.  The burden of proving a denial of discharge under § 727(a)(1)-(12) is by a preponderance of the evidence.  *Beaubouef v. Beaubouef*, (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992).  The Court will address each of the Plaintiffs' objections to discharge in turn.

**A.  Section 727(a)(2)(A)**

Congress intended § 727(a)(2) to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets.  To sustain an objection under § 727(a)(2)(A), the proof must show: (1) that the act complained of was done within the one year before the date of the filing of the petition; (2) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done; (3) that the act was committed by the debtor or a duly authorized agent of the debtor; and (4) that the act was done with actual intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code.  For purposes of analyzing what constitutes a transfer under § 727(a)(2), the definition of transfer is to be applied as broadly as possible.  *See Village of San Jose v. McWilliams*, 284 F.3d 785, 793-94 (7th Cir. 2002) (citations omitted).

The Court finds that Defendant or his duly authorized agent transferred property within one year before the date of filing the petition, thereby satisfying the first three requirements of § 727(a)(2)(A).  Defendant filed Chapter 7 bankruptcy on August 23, 2011.  In the year prior to the Chapter 7 filing, Defendant transferred roughly $166,330 to the Willawall Trust Account.

(UST – 52-75)   The Trust paid no consideration for the transfer of funds.  Defendant claims that all the money that was transferred to the Trust was for the benefit of his daughter.  When examining the amount of money transferred to the Trust; however, it is clear that the purpose of the transfer of funds was to support Defendant first and his daughter second by paying Defendant's living expenses.  Trust bank records show that Defendant used the JP Morgan Trust Account to make his March – August 2011 house payments; and from October 2009 – August 2011 to pay for groceries, meals for eating out, cell phones, cable and internet, home utilities, and gasoline for multiple vehicles.

The Court finds that Defendant maintained control over, and made use of, the Trust and the Trust assets since its creation in 2009.  (UST – 52-75; UST – 112 at 37-39).  First, Defendant maintained a life estate in the $412,000 Butte Hill Property and transferred only a remainder interest to the Trust.  (PL – 156).  Second, Defendant is and has always been the only person with signatory authority on the bank accounts of the Trust and Willawall Account.  (UST – 18).  Finally, from October 2009 until Defendant filed for bankruptcy, Defendant used the Trust Account funds to pay for his groceries, meals, cell phones, cable and internet service, home utilities, and gasoline for his vehicles.  (UST – 52-75).

Defendant also utilized Trust funds and vehicles for the benefit of his businesses.  Jeffcoat, however, contributed a significant portion of the $322,046.38 to the Trust from her earnings.  Although it is unclear where all of the money came from, or who made the deposits, Defendant admitted to making every transfer from the Debtor's and Jeffcoat's Chase Bank Joint Account (the "Joint Account") to the Trust Account.  Specifically, from June 2009 to June 2011, Jeffcoat and Defendant made cash deposits of $219,898.72 into the Trust account and transferred $34,400.03 from other accounts.  (UST – 52-75).

The Court finds that the Willawall Investments Trust is Defendant's alter ego. He transferred all of his personal assets to the Trust, but not his liabilities. The transfers of all his assets rendered him insolvent. Defendant was the only trustee with the right to sign on the Trust's bank accounts. Snell and Stouwie were nominal trustees who did not exercise any control over the Trust and did not administer the Trust for the benefit of the beneficiary. Defendant used Trust funds to pay his personal expenses. Texas law holds that an entity will be treated as a person's alter ego if there is such a unity between the entity and the individual that the separateness of the entity has ceased. *See **In re Main Place Custom Homes, Inc.***, 192 S.W.3d 564, 568 (Tex. 2006) (quoting ***Castleberry v. Branscum***, 721 S.W.2d 270, 272 (Tex. 1986)). Considering the totality of these actions taken by Defendant, the Court finds that Defendant satisfies the first three requirements for denial of discharge under § 727(a)(2)(A).

The final requirement to deny a discharge under § 727(a)(2) requires that the act complained of must be done with intent to hinder, delay, or defraud a creditor. ***Pavy v. Chastant (In re Chastant)***, 873 F.2d 89, 90-91 (5th Cir. 1989). Further, the intent must be actual intent and not constructive intent. ***First Tex. Sav. Ass'n, Inc. v. Reed (In re Reed)***, 700 F.2d 986, 991-92 (5th Cir. 1983). That said, a finding of actual intent may be based on circumstantial evidence or inferences from a course of conduct. ***Devers v. Bank of Sheridan (In re Devers)***, 759 F.2d 751, 753-54 (9th Cir. 1985).

> The Fifth Circuit has identified the following factors that may provide evidence of actual intent to defraud: (i) a lack of inadequacy of consideration, (ii) a familial or close relationship between the parties (iii) retention of possession, benefit, or use of the property in question, (iv) the financial condition of the party sought to be charged both before and after the transaction in question, (v) the existence or cumulative effect of a pattern or course of conduct after the incurring of a debt, onset of financial difficulties or threat of suits by creditors, and (vi) the general chronology of the events and transactions at issue.

*TSCA-234 Limited P'ship v. Moseman* (*In re Moseman*), 436 B.R. 398, 408-09 (Bankr. E.D. Tex. 2010) (citing *Pavy*, 873 F.2d at 91).

Using the Fifth Circuit's test in *Pavy*, the Court finds that Plaintiffs have met their burden under § 727(a)(2)(A) in establishing the requisite intent to hinder, delay or defraud a creditor.

*1. Lack or Inadequacy of Consideration.*

Defendant created Willawall Investments, Inc. and subsequently created the Trust which included not only Defendant's pool business; but also a quitclaim deed of Defendant's homestead, a Motor Home, a 2002 Ford Truck, a 2007 Honda Odyssey, a Grand Junction Trailer, the stock in Willawall, two Dell computers, and $322,046.38 in funds.[18] The Trust in return paid nothing for the assets. Further, Defendant, notwithstanding his status as the trustee and a grantor of the Trust, directly benefitted from the assets that were placed into the Trust. Notably, he lived in the home, used the motor home for transacting business for his pool company, and used the funds in the Trust to pay for his living expenses such as food, meals, the mortgage, and other personal expenses of Defendant. Defendant argued that all of the expenses incurred were for the benefit of his minor child because Defendant had custody of the child. While there was a benefit to the minor child, the evidence demonstrated that it was Defendant who exercised exclusive control over the Trust assets and primarily benefitted from the use of those assets.

*2. A Familiar or Close Relationship Between the Parties*

The connection between the parties is that the Trust in which Defendant transferred the majority, if not all, of his personal and business assets is for the benefit of his minor child and Defendant served as trustee of the trust and controlled the disposition of all of the trust assets.

---

[18] The Court recognizes that the only transfers that occurred within one year of the Chapter 7 petition were the $152,005.69. That said, all of the transfers to the Trust evidenced the same fact scenario: a transfer of an asset to the Trust for no consideration; the primary beneficiary of the transaction was Defendant; and as to the cash, the transfers of cash occurred while Defendant was in litigation with the Lowry Plaintiffs.

Further, all of the money that Defendant transferred to the Trust was used for Defendant's living expenses.

    3.  *Retention of Possession, Benefit, or Use of the Property in Question*

As noted in factors 1 and 2, Defendant controlled the use and disposition of all of the assets transferred to the Trust. Further, even though Defendant asked Snell and Stouwie to also serve as trustees, the evidence was conclusive that Defendant exercised complete control over the Trust. The use of the vehicles, the sale of the Motor Home, and the transfers of cash were all by Defendant. Moreover, the U.S. Trustee conclusively proved that the cash expended for meals and living expenses was primarily for the benefit of Defendant.

    4.  *The Financial Condition of the Party Sought to Be Charged Both Before and After the Transaction in Question.*

The series of transfers that Defendant and his wife implemented prior to filing bankruptcy ensured that the Debtor owned little at the time of filing but had significant debts to creditors. Defendant's Third Amended Schedules and SOFA (UST-4,5) indicate that Defendant had a life estate in the Butte Hill property with a value of $400,000 and limited personal assets with the exception of 2007 Acura MDX. His Third Amended Schedule F filed on October 31, 2011, shows unsecured, non-priority debt of $1,050,000. The majority of that debt is legal fees and credit card debt. Because Defendant transferred almost all of personal and business assets to the Trust, he cannot repay creditor claims.

    5.  *The Existence or Cumulative Effect of the Pattern or Series of Transactions or Course of Conduct after the Incurring of Debt, Onset of Financial Difficulties, Or Pendency or Threat of Suits by Creditors.*

Defendant asserts that the divorce proceeding with his wife and the related custody battle for their minor child resulted in significant drains of cash and also drained him emotionally. Also, Defendant asserts that the litigation with the Lowry Plaintiffs and the litigation associated

with him filing bankruptcy (the §§ 523 and 727 proceedings) have also depleted him of any cash he would have had to pay creditors.

The Court acknowledges that Defendant has incurred significant legal fees. The divorce action and the custody battle no doubt cost the Debtor significant funds. That said, the primary factor that caused Defendant to file bankruptcy was his pursuit of frivolous lawsuits against the Lowry Plaintiffs that resulted in the Lowry Plaintiffs obtaining state court judgments against Defendant for sanctions. Further, upon obtaining the state court judgments in 2010 and 2011 (PL – 127-130), the Lowry Plaintiffs incurred costs in defending the state court lawsuits and pursuing the collection of the judgments against Defendant. The collection of the judgments was exacerbated by Defendant's willful and malicious conduct against Lowry personally through the publication of her credit report and disclosure of her financial information. As a result, Lowry had to file suit in federal district court in response to Defendant's malicious attacks on her. Simply put, had Defendant not pursued frivolous litigation against the Lowry Plaintiffs, his scheme to shield assets into the trust may have gone unnoticed because Defendant may have not needed bankruptcy protection.

6.  *The General Chronology of the Events and Transaction Under Inquiry*

As noted herein, Defendant engaged in dual tracks of transferring almost all his assets to a trust while pursuing frivolous lawsuits against the Lowry Plaintiffs. While the transfer of assets to the Willawall Trust predates the Lowry Plaintiff litigation, the evidence shows that Defendant engaged in a series of transactions (sale of Motor Home, proceeds deposited into a new bank account, withdraw of cash in sums of less than $10,000 from new bank account; money that is withdrawn given to third parties for the startup of a dog training business) that were undocumented and orchestrated to evade financial reporting requirements and the reach of

creditors. These transactions occurred while Defendant originated or participated in litigation against the Lowry Plaintiffs.

The Court finds that by applying the *Pavy* factors and in analyzing the other three elements under § 727(a)(2)(A), the Plaintiffs have met their burden under § 727(a)(2)(A) and Defendant is denied his Chapter 7 discharge under § 727(a)(2)(A).

### B. Section 727(a)(2)(B)

Section 727(a)(2)(B) states that a debtor is denied a discharge under Chapter 7 if the debtor conceals property of the estate. The Debtor did not disclose any cash in the JP Morgan Chase Trust Account (No. xx -8937) or Compass Trust Account (No. xx -6698) in his original Schedules or amendments. (UST – 3-5). As of the petition date, Defendant had $5,276.85 in the Chase account and $73.12 in the Compass account. He also had a PayPal account as of the petition date which Defendant did not disclose until his Third Amended Schedules. Defendant did not disclose his Chase Joint Account until his Second Amended SOFA filed on February 17, 2012.

The SOFA, question #14 asks the debtor to disclose all property the debtor owns or controls for the benefit of another. SOFA, question #11 asks the debtor to list all financial accounts held in the name of the debtor or for the benefit of the debtor that were closed, sold, or transferred within one year of the filing of the case. Also, Schedule B, question #2 asks the debtor to disclose all checking, savings, or other financial accounts.

Defendant argues that he did not need to disclose the JP Morgan Chase and Compass bank accounts because they do not belong to him, but to the Trust. The evidence at trial showed that Defendant used the funds in these accounts to pay his living expenses. For example, the U.S. Trustee produced summaries of Defendant buying meals for himself and his daughter in the

amount of $5,017.76 for 2009; $19,563.63 for 2010; and $4,382.70 for 2011.  Further, the Trust account paid for Defendant's mortgage, utilities, and other living expenses.   Question #14 required Defendant to disclose any accounts that he was holding for the benefit of another. Accepting Defendant's argument that he did not think he needed to disclose the JP Morgan Chase and Compass bank accounts in his Schedules, he still had an obligation to disclose them in the SOFA.

Defendant also argued that because he filed his Chapter 7 case pro se, and it was Snell, a non-lawyer who advised him about how to prepare his Schedules and SOFA; that Defendant's omissions from his SOFA are excusable based upon lack of knowledge or poor advice. Defendant also argued that once he obtained competent bankruptcy counsel to represent him, most of the omissions in his Schedules and SOFA were corrected. These arguments do not address Defendant's obligation to disclose the bank accounts.   The requirements regarding disclosure in the Schedules and SOFA are self-explanatory and impose a high degree of transparency on every debtor.  Rather than assume he did not need to disclose these accounts, Defendant should have been forthcoming about the bank accounts.  This consideration is made more apparent by Defendant's attendance at his § 341 meeting and the Chapter 7 Trustee's questions to him regarding the accuracy of his Schedules and SOFA and whether he needed to list anything not previously listed.  (*See* Transcript of § 341 meeting).

There is no rational explanation for Defendant's omissions of these bank accounts; particularly given the number of amendments to the Schedules and SOFA filed in this case. Moreover, Defendant's lack of credibility on so many factual issues in this matter undercuts any assertions that these omissions were innocent or unintentional.  As such, Defendant is denied his discharge under § 727(a)(2)(B).

### C.  Section 727(a)(3)

The Court may deny Defendant's discharge under § 727(a)(3) if the Plaintiffs can demonstrate that Defendant failed to keep records that "are those of creditors and that the [Debtor] is required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *Koufman v. Sheinwald*, 83 F.2d 977, 980 (1st Cir. 1936).

Under § 727(a)(3), the debtor's obligation is to keep records in a form that enables a creditor to ascertain the debtor's current financial condition and to follow his business transactions in the past.  *See In re Juzwiak*, 89 F.3d 424 (7th Cir. 1996) (denying discharge because there was no proof of payroll records).  As such, the Court must examine the materiality of the missing business transactions.  In doing so, a plaintiff must show by a preponderance of the evidence that the defendant failed to keep or preserve financial records and the failure to do so prevented a party from ascertaining the defendant's financial condition or business transactions.  Once a plaintiff establishes a prima facie case, the defendant has the burden of establishing that his failure to keep adequate records was justified under all circumstances of the case.  *In re Lee*, 309 B.R. 468, 477-78 (Bankr. W.D. Tex. 2004).

Section 727(a)(3) requires debtors to present a full financial picture to the trustee, creditors, and the court.  *Row et al v. Henley (In re Henley)*, 480 B.R. 708, 781 (Bankr. S.D. Tex. 2012) (citation omitted).  "The failure to maintain financial records justifies a denial of discharge." *Id.* (citations omitted).  Notably, a trustee or a creditor need not prove any fraudulent intent by a debtor to deceive creditors; rather, mere negligence in failing to keep and produce records is sufficient to deny a debtor's discharge under § 727(a)(3).  *Id.* (citations omitted).

At trial, Defendant was unable to produce documents sufficient to explain how the proceeds of the sale of the Motor Home were used to purchase the guard dog business. While Defendant states that he withdrew cash from the Trust Account in amounts under $10,000, thereby evading IRS reporting requirements, and then paid for the dogs, kennels, and materials to construct the facility that housed the dogs; there is no clear record evidence that shows that these events actually occurred.

The evidence produced at trial shows that Defendant took the cashier's check from Ancira for the sale of the Motor Home and deposited it in a newly created Trust Account at Compass Bank. He then withdrew all of the money out in twenty withdrawals of $9,000 each. (PL – 291). He then purportedly gave all the money to Snell, who is now deceased. There is no documentation to reflect that the money was actually given to Snell.

Defendant testified that after he gave the $166,000 to Snell, he formed a business venture with Nunez to form Universal K-9, for the purpose of acquiring guard dogs and training them for sale. Further, the Trust - through Snell - entered into a joint venture between Nunez and Universal K-9 in which the Trust would finance the venture with the $166,000 that Defendant gave to Snell. At trial, several documents were submitted as purportedly representing the acquisition of the dogs, kennels, and supplies for Universal K-9. First, there is a bill from Universal K-9 to the Trust that represents the purchase in cash of 12 dogs for $144,000 in addition to $22,000 in labor, materials, and a one year lease. (D – 8). Additionally, there is a bill from Jiri Hales to Universal K-9 showing a $96,000 invoice for eight dogs. (PL – 159). Defendant also submitted into evidence an email from Hales to Defendant that included a quote for the purchase of ten dogs at $12,000 per dog, $11,500 for kennels and transport from the Czech Republic, less a $14,500 deposit. (D – 10).

45

As a result of the multiple documents submitted into evidence for the same transaction and the conflicting stories of several witnesses as to what actually transpired regarding Universal K-9, the Court must evaluate Defendant's explanation regarding the deficiency in his records for its credibility and reasonableness under the circumstances of the case and the materiality of those deficiencies. *Henley*, 480 B.R. at 477-78 (citations omitted). The Court may consider if the inadequacy of the records is justified under the circumstances. *First United Bank & Trust Co. v. Buescher (In re Buescher)*, 491 B.R. 419, 438-39 (Bankr. E.D. Tex. 2013). Factors the Court may consider include: (1) the education, experience, and sophistication of the debtor; (2) the volume of the debtor's business; (3) the complexity of the debtor's business; (4) the amount of credit extended to the debtor in his business; and (5) any other factors the Court may consider in the interest of justice. *Id.* (citations omitted). None of these factors mitigate in favor of Defendant. Defendant operated a pool business – it had few employees. There are no records from the pool business to substantiate much about Defendant's business. It is unknown about the volume, complexity, or credit extended, to Defendant's business. Moreover, the entity that had most, if not at all, of Defendant's assets is the Willawall Trust.

Defendant resisted disclosing any information about the Trust, and, more importantly, drained most of the funds in the Trust for his benefit. There is no clear record of how Universal K-9 was funded, what happened to the dogs, or how much money was actually used for the business's start up and formation. The inconsistency of stories regarding the formation and funding of Universal K-9 and its ultimate demise, coupled with Defendant's lack of disclosure about the Trust and how he transferred assets into it, support the Court's finding that Defendant failed to keep sufficient records to assist the Trustee, creditors, and the Court from ascertaining

the truth regarding Universal K-9. As such, Defendant violated § 727(a)(3) and is denied his Chapter 7 discharge.

### D. Section 727(a)(4)(A)

11 U.S.C. § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account. . . ." Plaintiffs allege that Debtor made a number of omissions and/or false statements in his sworn Schedules of Assets and Liabilities and Statement of Financial Affairs, each of which will be discussed in detail below.

In general,

[t]he purpose of Chapter Seven of the Bankruptcy Code is to give individual debtors a "fresh start," and the heart of this goal is embodied in § 727's discharge provisions. *See, e.g.,* S. Rep. No. 989, 95th Cong., 2d. Sess. 7 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5793. "The discharge provisions require the court to grant the debtor a discharge of all his debts except for very specific and serious infractions on his part."

*In re Ichinose*, 946 F.2d 1169, 1172 (5th Cir. 1991).

Consistent with this general approach, it is the plaintiff who has the burden of proving an objection to discharge under § 727(a)(4)(A). *Beaubouef*, 966 F.2d at 178. "The elements of an objection to discharge under § 727(a)(4)(A) must be proven by a preponderance of the evidence." *Id.* Those elements are: "'(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (quoting *Beaubouef*, 966 F.2d at 178). "An omission of an asset can constitute a false oath." *Pratt*, 411 F.3d at 566.

Moreover, "Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements." *Interfirst Bank Greenville, N.A., v. Morris (In*

*re Morris)*, 58 B.R. 422, 427 (Bankr. N.D. Tex. 1986) (McGuire, J.).  Innocent mistakes and inadvertence are generally not sufficient to result in denial of a discharge.  *See e.g., Mozeika v. Townsley (In re Townsley)*, 195 B.R. 54, 65 (Bankr. E.D. Tex. 1996) (Sharp, J.) ("The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence.  Rather, to sustain an objection to discharge under this section, the debtor must have willfully made a false statement with intent to defraud his creditors.").

A debtor need not have acted deliberately to deceive, however.  *Beaubouef*, 966 F.2d at 178 ("It makes no difference that [the debtor] does not intend to injure his creditors when he makes a false statement.  Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.") (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (*per curiam*)).  The requisite intent can be shown by establishing that the debtor acted with reckless disregard for the truth, which can be proven by circumstantial evidence.  *In re Sholdra*, 249 F.3d 380, 382 (5th Cir. 2001) ("[S]tatements [made] with fraudulent intent–or reckless indifference to the truth . . . can be proven by circumstantial evidence."); *Beaubouef*, 966 F.2d at 178 ("[T]he existence of more than one falsehood, together with [the debtor's] … failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive."); *accord, Ford v. Mellon Fin. Serv. Corp. (In re Ford)*, Civ. A. No. H-85-3551, 1986 WL 14997, at *4 (S.D. Tex. December 18, 1986) ("When impeached, Debtor candidly admitted that expediency motivated the deception.  Such reckless disregard for the truth is circumstantial evidence of the requisite fraudulent intent and will alone support denial of discharge."); *In re Sullivan*, 204 B.R. 919, 942-43 (Bankr. N.D. Tex. 1997) (Abramson, J.) ("A

series of even innocent mistakes or omissions can constitute evidence of a pattern of reckless disregard for the truth. . . . Thus, courts look at the circumstances surrounding the omissions to determine whether they were intentional.") (citing ***Morris***, 58 B.R. at 428).

The evidence before the Court is replete with Defendant's false oaths. In summary form, here are Defendant's omissions and false statements:

1. Defendant changed his story multiple times regarding the ownership of vehicles (Motor Home, 2002 Ford Truck, 2007 Honda Odyssey, and Grand Junction Fifth Wheel Trailer). His first SOFA did not disclose that he had transferred the vehicles to the Trust within two years of filing bankruptcy. (UST - 2). Defendant then amended his SOFA to reflect that he transferred the vehicles to the Willawall Investments Trust. (UST - 52). Defendant also stated at his § 341 meeting that his swimming pool maintenance company – Willawall Investment, Inc. – owned the vehicles. (*See* Transcript of § 341 meeting, September 30, 2011). Defendant also testified at trial that he transferred the swimming pool company and all his assets to Jose Contreras, an employee of the pool business that was being paid $10.00/hour, in exchange for Contreras's promise to pay Defendant $10,000 at some unspecified date. After Defendant's § 341 meeting, Defendant amended his Schedules and stated in his Schedule B that he owned the vehicles. (UST – 4). Defendant amended his SOFA and Schedules again to show that the Trust owned the vehicles. (UST – 5).

2. Defendant did not disclose in his SOFA, question #10 that he transferred Willawall Investments Inc. within two years of filing bankruptcy. Defendant stated at his § 341 meeting that he sold Willawall Investments Inc. to Contreras for $10,000, and that Contreras would pay Defendant at some unspecified future date.

3. Defendant did not disclose on his SOFA, question #10 that he and his wife transferred over $300,000 in cash to the Trust in the two years prior to filing bankruptcy. Although Defendant argued that his wife made the transfers, the evidence showed that Defendant made the transfers from the Joint Account to the JP Morgan Trust Account because Defendant was in control of the Trust both before and after the transfers and he was the person who filled out the deposit slips. (UST – 52-75).

4. Defendant did not disclose the Chase Trust Account and the Compass Trust Account.

Defendant has not satisfactorily explained the omissions and discrepancies in his SOFA and Schedules. The "mistakes" are neither innocent nor inadvertent. The multiple sworn Schedules and SOFA's show a pattern indicating lack of honesty. The Fifth Circuit has noted that when the schedules and statements contain omissions and inconsistencies, they can evidence a pattern of deceit that supports fraudulent intent. *In re Dupre*, 145 F. App'x 855, 856 (5th Cir. 2005).

Defendant argues that he made changes to his schedules and statements to cure the omissions. In this case, the amendments do not cure the omissions. The Fifth Circuit has found that once the debtor's wrongful and reckless conduct has been exposed; the debtor may not escape the consequences of such conduct by simply amending his schedules and disclosing the omitted assets. *Sholdra*, 249 F.3d at 382-83. Even accepting Defendant's argument in this instance as credible, Defendant cannot explain why it took so many amendments to disclose hidden property or why, once he made certain disclosures, his Schedules and SOFA were still inaccurate and contradicted earlier amendments. Further, even during the course of trial, Defendant made inconsistent statements, particularly with regard to how Universal K-9 was funded and operated.

The omission of the Chase Trust Account and Compass Trust Account is inexplicable. The Fifth Circuit has ruled that "few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of assets that the creditors can discern not only the overall picture of the debtor's financial affairs, but also detail the debtor's finances." *Pratt*, 411 F.3d at 567.

The Plaintiffs demonstrated that the disbursements from the Trust accounts went to pay for Defendant and his daughter's living expenses – mortgage, utilities, food, and necessities. The U.S. Trustee provided a summary at trial that showed that the Trust was paying for Defendant's meals on a daily basis. Further, although Snell and Stouwie did at times serve as trustees, the only person with the requisite control and access over the Trust was Defendant. Defendant treated the Trust accounts as his own accounts that he used to pay his own personal expenses. Accepting Defendant's argument that he honestly believed that he did not need to disclose the Trust accounts because they were not his personal accounts, SOFA question #14 requires the debtor to disclose property owned by another that the debtor controls. This question required Defendant to disclose the Trust accounts. *See In re Riley*, 128 B.R. 567, 569 (Bankr. N.D. Ok. 1991) (The debtor does not have the option to decide which questions in the SOFA he answers or how he answers them. All questions on the SOFA should be answered completely and honestly). The Trust was not set up for the benefit of Defendant's daughter; it was simply a device to shield assets from creditor claims and provide Defendant with a ready source of income without any accountability to the estate.

### E. Section 727(a)(5)

Section 727(a)(5) provides that a debtor will be denied a discharge where the debtor fails to explain satisfactorily the loss of assets or deficiency of assets to meet the debtor's liabilities.

Section 727(a)(5) does not require specific allegations of fraud but does require that the plaintiff identify which assets have been lost.  *See Nof v. Gannon*, 173 B.R. 313 (Bankr. S.D.N.Y. 1994) (denial of discharge warranted on fraudulent withholding of information).

The initial burden is on plaintiffs to show some evidence that assets have been lost and then the debtor to explain what happened to the assets.  *See Chalik*, 748 F.2d at 619 (11th Cir. 1984) (*per curiam*) (denial of discharge warranted for failure to explain loan of $130,000 to debtor).  The burden on the debtor is to explain satisfactorily to the Court what has happened because the debtor has access to the operative facts.  *Poolquip-McNeme, Inc. v. Hubbard (In re Hubbard)*, 96 B.R. 739, 742 (Bankr. W.D. Tex. 1989).

Plaintiffs showed that Defendant transferred all of his personal assets into the Willawall Trust.  Defendant explained that he did so for the benefit of his daughter.  Defendant could not explain, however, why most of the cash put into the Trust was spent on him, and not his daughter.  Defendant could also not explain why he needed to create a Compass Bank account for the Trust when he already had a Trust Account at JP Morgan Chase Bank.  Defendant did not explain why he designated Snell and Stouwie as trustees of the Trust, yet continued to control the Trust bank accounts and spend Trust monies on him.  Defendant further could not account for how the Trust monies were spent on him.  Defendant did not explain why he retained a life estate in his home and gave the Trust a remainder interest.  Defendant cannot account or show how $166,000 was used to fund Universal K-9, nor can he show what happened to the guard dogs.  In sum, Defendant has not provided the Court or the creditors with satisfactory documentary proof of the loss of the assets or credible testimony that explains the disposition of these assets.  As such, the Court finds that Defendant is denied his discharge under § 727(a)(5).

III.  <u>Non-dischargeability Under 11 U.S.C. § 523(a)(6)</u>

Section 523(a)(6) provides that an individual debtor will not get a discharge from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." For the act to be willful and malicious "a debtor must have acted with 'objective substantial certainty or subjective motive' to inflict injury." *In re Williams*, 337 F.3d 504, 508-09 (5th Cir. 2003) (citing *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998)). Whether the acts were substantially certain to cause injury (the "objective test") is based on "whether the [d]efendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's *subjective* intent was to inflict a willful and malicious injury on the Plaintiff." *In re Powers*, 421 B.R. 326, 335 (Bankr. W.D. Tex. 2009) (emphasis in original). A subjective motive to cause harm (the "subjective test") exists when a tortfeasor acts "deliberately and intentionally, in knowing disregard of the rights of another." *See Miller*, 156 F.3d at 605-06 (adopting the definition of "implied malice" from *In re Nance*, 566 F.2d 602, 611 (1st Cir. 1977)).

The Supreme Court has determined that the word "willful" under § 523(a)(6) modifies the word "injury," indicating that a finding of nondischargeability requires a deliberate or intentional injury, not merely a deliberate act that results in injury. *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998). In defining the term "malicious" under § 523(a)(6), the Fifth Circuit holds that it means "implied malice," as opposed to "special malice." *Miller*, 156 F.3d at 605. "Implied malice" means "acts done with the actual intent to cause injury," whereas "special malice" requires a showing of a motive to harm. *Id.* The Fifth Circuit, in recognizing that the definition of implied malice is the same standard used by the Supreme Court for "willful injury,"

53

held that a finding of implied malice can render a debt non-dischargeable under § 523(a)(6). *Id.* (discussing *Kawaauhua*, 523 U.S. 57).

In analyzing a dischargeability of debt determination under § 523(a)(6), the Court must examine the events or facts that caused the plaintiff harm. Here, Defendant filed four lawsuits against the Lowry Plaintiffs. The first was a mandamus action seeking AMS business records that Defendant dismissed before the state court could rule on the Lowry Plaintiffs' defenses to the suit. (PL – 127). The other three lawsuits involved suits in which Defendant sought damages. In the second lawsuit that Defendant filed, he accused Lowry of "accounting regularities, fraudulent management practices, money laundering: and other acts of malfeasance. (PL – 128). The Court granted Lowry's motion to dismiss for want of jurisdiction. (PL – 128). Defendant then filed a second suit for damages against Lowry and AMS, and made similar allegations of impropriety against Lowry and AMS as Defendant had in the first suit for damages. (PL – 129). Defendant non-suited this case but not before the state court ordered sanctions against Defendant for harassing AMS and making frivolous arguments against AMS for seeking relief that failed to comport with existing law. (PL – 129B). The state court found Defendant liable for $4,000 in expenses for bringing a frivolous cause of action and $5,000 in attorney's fees. (PL – 129B). Defendant then filed a fourth suit against AMS asserting the same allegations of fraud and malfeasance, plus also alleging collusion between AMS and the Shavano Rogers Swim Club to facilitate further acts of fraud and malfeasance against homeowners. This suit was also dismissed and included an award of attorney's fees and costs against Defendant for initiating yet another frivolous lawsuit.

Additionally, the Court heard a taped conversation between Defendant and Jeffcoat in which Defendant told his then wife in a profanity laced tirade that he would have considered

beating Lowry, stuffing her in the trunk of his car, and leaving her on the side of the road as an alternative to filing suit against Lowry and AMS.  (PL – 155).

While the Court recognizes that it has already denied Defendant his discharge for multiple reasons under § 727, the Court finds that in the alternative that the sanctions awards are non-dischargeable under § 523(a)(6).  Defendant's clear intent and motive in filing four lawsuits against the Lowry Plaintiffs was to maliciously and willfully harm their business reputation, good standing, and ability to manage their client HOAs.  Defendant's sole purpose in filing the suits was to destroy Lowry and AMS.  Defendant's objective intent was to cause the Lowry Plaintiffs harm, and he knew that filing the lawsuits would injure AMS and Lowry's business reputation.   From a subjective perspective, Defendant's actions were willful and malicious.  He filed frivolous lawsuits, posted harmful and inaccurate allegations against AMS and Lowry on the internet, and even considered physically harming Lowry in an effort to destroy her and her business.

Likewise, the damages awarded to the Plaintiff in the FCRA action are non-dischargeable under § 523(a)(6).  Defendant obtained Lowry's consumer report for the sole purpose of attempting to discredit and embarrass her publicly and within the business community.  Defendant posted Lowry's consumer report to a publicly available website with full knowledge that such publication of sensitive and private information was substantially certain to cause her harm.  (PL – 164).  As evidenced by the taped conversation between Croft and Jeffcoat, Defendant posted Lowry's credit report willfully and maliciously to the Reliance website in an attempt to harm her reputation, her credibility, and her business.  (PL – 155).  This Court finds that Defendant's objective intent was to cause Lowry harm because a reasonable person would conclude that posting a person's credit report on the internet is substantially certain to result in

harm.  From a subjective perspective, Defendant posted Lowry's consumer report willfully and maliciously in order to further harm Lowry and her business.  Defendant was aware of the likelihood of causing harm to Lowry if he posted her credit report on the internet yet deliberately chose to proceed with his course of action.  As such, the Court finds that the Sanctions Awards and the FCRA Awards are non-dischargeable under § 523(a)(6).

### CONCLUSION

For the reasons stated herein, Lowry's Complaint pursuant to 15 U.S.C. § 1681b(f) is GRANTED and Lowry is entitled to statutory damages in the amount of $1,000, punitive damages in the amount of $75,000 and costs of this action together with reasonable attorneys' fees.  Additionally, the Plaintiffs' Complaint pursuant to 11 U.S.C. §§ 523 and 727 is GRANTED under § 523(a)(6) and § 727(a)(2)-(5).  Pursuant to Fed. R. Civ. P. 54, Fed. R. Bankr. P. 7054, and Local Rule 7054, the Plaintiffs may make application for attorney's fees. All other relief is DENIED.

# # #